OPINION *Page 2 
{¶ 1} Defendant-appellant Jakei Jackson appeals his conviction entered by the Stark County Court of Common Pleas on three counts of violating a protection order, in violation of R.C. 2919.27(A)(1). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} In August, 2006, Laura Ganser obtained a civil protection order effective for five years against Appellant, her ex-boyfriend. In September, 2005, Appellant violated the order, and was convicted of menacing by stalking.
 {¶ 3} In November, 2006, Appellant contacted Ganser by telephone stating he wanted to see her and take her out. Later in the same day, Appellant sent a text message to Ganser. Ganser called the Stark County Sheriffs Department to report the communication. Ganser asserts Appellant continued to visit her place of employment, park his car in front of her home and drive up onto her front lawn. The events continued from November of 2006, to July of 2007.
 {¶ 4} On July 25, 2007, Stark County Deputy Sheriff Cliff Hall observed Appellant's vehicle on St. Elmo Avenue near Ganser's residence, after Ganser reported by telephone to the Stark County Sheriffs Department Appellant had pulled up on her front lawn.
 {¶ 5} The Stark County Grand Jury indicted Appellant on one count of menacing by stalking, a violation of R.C. 2903.211(A)(1)(B)(2) and three counts of violating a protection order, in violation of R.C. 2919.27(A)(1). *Page 3 
 {¶ 6} The matter proceeded to a jury trial on October 17, 2007. The jury returned a verdict of guilty on all the charges. The trial court then sentenced Appellant to consecutive and maximum sentences totaling fifty-four months in prison.
 {¶ 7} Appellant now appeals, assigning as error:
 {¶ 8} "I. APPELLANT'S CONVICTIONS FOR THREE COUNTS OF VIOLATION OF PROTECTION ORDER WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 9} Initially, we note Appellant does not challenge his conviction for menacing by stalking, for which he received an eighteen-month prison sentence. Rather, Appellant maintains his convictions for violating the protection order were against the manifest weight of the evidence.
 {¶ 10} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N .E.2d 541 super ceded by constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence *Page 4 
and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 11} Appellant was convicted of three counts of violating a protection order in violation of R.C. 2919.27(A)(1), which reads:
 {¶ 12} "(A) No person shall recklessly violate the terms of any of the following:
 {¶ 13} "(1) A protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code;"
 {¶ 14} Upon review of the record, the civil protection order at issue indisputably prohibited Appellant from contacting Ganser via telephone, at her residence or place of employment. Appellant was aware of the order as he had been previously convicted of violating the same in September of 2005.
 {¶ 15} At trial, Ganser testified:
 {¶ 16} "Q. Now, Laura, I'm going to bring you to the time period from 11/15 — November 15, 2006 to July 26, 2007. Did you continue to have problems with the Defendant?
 {¶ 17} "* * *
 {¶ 18} "Q. I'm going to call your attention specifically to November 15 —
 {¶ 19} "A. Okay.
 {¶ 20} "Q. — 2006. Did the Defendant contact you on that date?
 {¶ 21} "A. Yes. I received a private call on my cell phone and I'm the emergency contact at work. And I answered the phone and no one answered. And I didn't know if it was a wrong number. So about an hour later, private call came up again and I answered it, and it was the Defendant. *Page 5 
 {¶ 22} "Q. And what did he say?
 {¶ 23} "A. He said he wanted to ask me some questions and he's never had a thing for someone like me before, and he just wanted to see me and he wanted to take me out. And I told him that I was calling the police and that he was throwing his life away and to leave me alone.
 {¶ 24} "Q. Did he contact you further that day?
 {¶ 25} "A. Yes, he text messaged me then later on that day saying that it's — he had a good time talking to me in our conversation that day.
 {¶ 26} "Q. Let me ask you this, you indicated you have a cell phone?
 {¶ 27} "A. Uh-huh. Yes.
 {¶ 28} "Q. And you have a specific cell phone number?
 {¶ 29} "A. Yes.
 {¶ 30} "Q. How long have you had that number for?
 {¶ 31} "A. Oh, gosh. I could guesstimate maybe a year, year and a half, something like that.
 {¶ 32} "Q. Was the Defendant aware of that number at that time period?
 {¶ 33} "A. The only — I didn't believe so. But, again, I'm the emergency when you call the office.
 {¶ 34} "Q. Well, let's — let's go into that. What type of work do you do?
 {¶ 35} "A. I work for a dental office. I'm an RN, but I work for a dental office.
 {¶ 36} "Q. And how long have you worked at that dental office?
 {¶ 37} "A. Almost nine years.
 {¶ 38} "Q. What are your duties there? *Page 6 
 {¶ 39} "A. I assist the dentist. I'm basically his personal assistant, plus any treatments that have to be planned, any surgeries that have to be carried out, I am side by side involved with him in that. And contacting medical doctors to find out, you know, what meds need to be stopped at the time because of surgery that's going to be coming up in our office. I field all the emergency calls.
 {¶ 40} "Q. So when the general public calls in to your office —
 {¶ 41} "A. The recording says that you can leave a message after the tone, or if this is an emergency, you can call this number, and it's my cell number.
 {¶ 42} "Q. Okay. It's your cell phone number?
 {¶ 43} "A. Yes.
 {¶ 44} "Q. Okay. Now, were you familiar, because of your relationship previously, of any cell phone numbers he had?
 {¶ 45} "A. Because of the text messages that he had sent and the calls that would — randomly he wouldn't block, they would come up and I became familiar with those number, yes.
 {¶ 46} "Q. Okay. First I'm going to show you what's been marked as State's Exhibit 2,. Do you recognize State's Exhibit 2?
 {¶ 47} "A. Yes, I do.
 {¶ 48} "Q. And what is that?
 {¶ 49} "A. That was the first text message he had sent me on November 15.
 {¶ 50} "Q. Okay. And how — how were you familiar and know it was the Defendant that sent this text message to you? *Page 7 
 {¶ 51} "A. Because his name is Jakei and he put, it's key's. I had a good time talking to you this morning, Ganser. I haven't dated anyone in about six years so I kind of — you know, you see that, you see the nickname there. And then that he still has a lot of love for me and would like to take me out sometime.
 {¶ 52} "Q. Okay. And had you previously seen that phone number, that phone number previously to that date?
 {¶ 53} "A. Not to that date, no.
 {¶ 54} "Q. Okay. Did you continue to receive phone calls during this time period?
 {¶ 55} "A. Yes.
 {¶ 56} "Q. Okay. Did you report this to the police?
 {¶ 57} "A. Yes, I did.
 {¶ 58} "Q. Do you recall where you were at when you made this report?
 {¶ 59} "A. When I — my first report that I had made since November 15th, I was at work.
 {¶ 60} "Q. Okay. And you called — and who did you call to report this — these messages?
 {¶ 61} "A. I called the Stark County Sheriff.
 {¶ 62} "* * *
 {¶ 63} "Q. Okay. In addition to the text messages and the previous phone calls, did you continue to have problems with the Defendant contacting you either by phone or text?
 {¶ 64} "A. Yes, I did. *Page 8 
 {¶ 65} "Q. Okay. Did you also have problems with you personally seeing the Defendant come into your place of employment?
 {¶ 66} "A. Yes, I did.
 {¶ 67} "Q. Do you recall the time period this was occurring?
 {¶ 68} "A. It was — it wasn't really a strong pattern, it was random.
 {¶ 69} "* * *
 {¶ 70} "Q. Specifically, Miss Ganser, I'm asking you during this time period, did you personally see the Defendant come to your place of employment?
 {¶ 71} "A. Yes, I did.
 {¶ 72} "Q. And how did you — how did that occur?
 {¶ 73} "A. There was several occasions when I was outside on my lunch break, from noon to 1 is my lunch break, and car — our parking lot — our business parking lot connects with another parking lot of a strip mall kind of and it extends out. And he came through our parking lot and just kept going all the way thorough and out the very end of the strip mall's parking lot. Was kind of just little drive throughs and drivebys.
 {¶ 74} "Q. And how often did you see him do it during this time period from November of 2006 until July of 2007?
 {¶ 75} "A. I'd have to say about five times.
 {¶ 76} "Q. Okay. I'm going to show you what I have marked as State's Exhibit 3A and 3B.
 {¶ 77} "Do you recognize State's Exhibit 3A and 3B?
 {¶ 78} "A. Yes, I do.
 {¶ 79} "Q. And what is that? *Page 9 
 {¶ 80} "A. It's a text message from him on Tuesday November 21st at 12:50 a.m.
 {¶ 81} "Q. And how did you recognize this text message?
 {¶ 82} "A. Because of the phone number. And he also called me by my last name a lot.
 {¶ 83} "Q. And this is the same phone number as State's Exhibit 2 in relation to the 412-6717?
 {¶ 84} "A. Yes, it is.
 {¶ 85} "Q. I'm going to show you what's been marked as State's Exhibit 4. Do you recognize State's Exhibit 4?
 {¶ 86} "A. Yes, I do.
 {¶ 87} "Q. And what is that?
 {¶ 88} "A. It's a text message from him again on Wednesday, November 22nd at 7:22 p.m.
 {¶ 89} "Q. And is that, you recognize the same cell phone number that you had been getting —
 {¶ 90} "A. Yes.
 {¶ 91} "Q. — the last two times?
 {¶ 92} "State's Exhibit 5. What is that?
 {¶ 93} "A. It's a text message from him again on Tuesday, November 28th at 8:25 p.m. again he calls me Ganser.
 {¶ 94} "Q. Again, is that from the same cell phone number?
 {¶ 95} "A. Yes, it is.
 {¶ 96} "Q. State's Exhibit 6. Do you recognize State's Exhibit 6? *Page 10 
 {¶ 97} "A. It's a text message again from that same number from him, Tuesday, November 28th at 9:37 p.m.
 {¶ 98} "Q. State's Exhibit 7A and 7B. Do you recognize that?
 {¶ 99} "A. It's the same cell phone number again and a text message from him on Sunday, December 10th at 5:55 p.m. And, again, he refers to me as Ganser.
 {¶ 100} "Q. State's Exhibit 8. Do you recognize that?
 {¶ 101} "A. It's the same cell phone number again from him, Sunday, December 10th at 5:55 p.m.
 {¶ 102} "Q. State's Exhibit 9A and 9B.
 {¶ 103} "A. I can't see the cell phone number.
 {¶ 104} "Q. I'm sorry.
 {¶ 105} "A. This was a new cell phone number that he had started calling me from and texting me. And it said, Saturday, January 13th at 8:57 p.m. And he referred to me as Ganser again.
 {¶ 106} "* * *
 {¶ 107} "Q. If you could, tell the jury what you remember occurring on February 21st, 2007.
 {¶ 108} "A. It was around 11:00 at night, and we had heard — my two kids and I were in our family room and we had heard a loud car go past. And actually my youngest son Brendan was the one who kind of jumped up and said, you know, something doesn't sound right because it came past again the second time.
 {¶ 109} "And we looked out the window and there was a car sitting in front of my home. And it sat there for a few minutes and then it drove on. And then within the next *Page 11 
probably five minutes, it came past again. And it pulled up into my neighbor's driveway and sat in my neighbor's driveway. And he flashed his lights and then turned them off and pulled up — backed out of my neighbor's driveway and pulled up in front of my house and sat there.
 {¶ 110} "Q. Did you end up calling the Sheriff's Department?
 {¶ 111} "A. Yes.
 {¶ 112} "* * *
 {¶ 113} "Q. I'm going to show you what's been marked as State's Exhibits 12A and 12B. Do you recognize State's Exhibit 12A and 12B?
 {¶ 114} "A. Yes, I do.
 {¶ 115} "Q. And what is that?
 {¶ 116} "A. It was a text message sent from that phone number again. And Friday, February 23rd at 10:28 a.m.
 {¶ 117} "Q. And then, finally, I'm going to show you what's been marked as State's Exhibit 13.
 {¶ 118} "A. Yes. It's the same cell phone number, Saturday, February 24th at 7:55 p.m.
 {¶ 119} "Q. Did you end up making another report on June 1st, 2007?
 {¶ 120} "A. Yes.
 {¶ 121} "Q. Do you recall what that was about?
 {¶ 122} "A. Yes, I do. I had come home from work and was sitting on the couch talking to my mom and I went outside and he had drove past and then went to the west of the end of the street and then came back up off of my street again. And that's when *Page 12 
he stopped in front of my house and put his hands up in the air and yelled to me, what's up, what's going on, why won't you talk to me? And that's when I had got a good look at the license plate and I yelled at him to leave me alone and that I was calling the cops. And I called the police and gave them the license plate number and said, please have somebody come out here.
 {¶ 123} "Q. Okay. And then a deputy ended up coming out to your residence on St. Elmo?
 {¶ 124} "A. Yes.
 {¶ 125} "Q. All right. Then, finally, I'm going to bring you to July 25th to July 27th — I'm sorry, July 25th through July 26th, 2007. Do you recall that incident?
 {¶ 126} "A. Yes, I do.
 {¶ 127} "Q. Could you describe to the jury what happened?
 {¶ 128} "A. Around 9:30 or so I was coming home from shopping and I was carrying my stuff into my house and he had drove past and stopped in front of my house and I just shook my head and looked the other way and went inside, and I locked everything up.
 {¶ 129} "Then that night at about 12:30, I wanted to get a little air in my house so I opened up my bedroom window about six inches or so and pulled the curtain back slightly so I could get some air, and turn off my lights and tried to go to sleep, get some rest for work the next day, and heard some loud music pull up in front of my house again, outside of my window on the street.
 {¶ 130} "So I thought, you know, it's just best, even though I get tired of being bothered with it, I thought it was best to call the police and see if they could have *Page 13 
somebody come out, and they seemed to always miss it by a few minutes. So, I said, could you just come out and have someone drive past, and, you know, I got to get some sleep for work tomorrow and kind of shoo him away.
 {¶ 131} "And I was on the phone with dispatch, I was standing up next to my bed, but I kept everything dark so that way he wouldn't know that I was up. And that's when I saw headlights come up towards — towards my window. And he pulled right in front of my bedroom window in my lawn. And so I dropped down to the ground because I thought he was going to come through my house. And I told dispatch what was happening, just asked them to please get someone out there because I didn't know what was going to happen.
 {¶ 132} "He took off after about a few minutes sitting in front of my window. And then a few minutes later he pulled up and did the same thing again in my lawn. And I just asked dispatch to please get someone there as soon as possible because I didn't know what was going to happen.
 {¶ 133} "And then the officer put me on hold for a second because something was going on, and then they came back on the phone and said that he was gone.
 {¶ 134} "Q. Were your children home at the time?
 {¶ 135} "A. No, thank god. They were at Scout camp."
 {¶ 136} Transcript at 144-174.
 {¶ 137} Deputy Sheriff Cliff Hall testified at trial:
 {¶ 138} "Q. And were you on duty from the time period of July 25, 2007 to the early morning of July 26, 2007?
 {¶ 139} "A. Correct. *Page 14 
 {¶ 140} "Q. And was that the midnight shift?
 {¶ 141} "A. Yes.
 {¶ 142} "Q. Did you receive a call shortly after midnight regarding an incident that had occurred at 2955 St. Elmo Avenue northeast in Canton?
 {¶ 143} "A. Yes.
 {¶ 144} "Q. Okay. Do you recall at the time where you were at when you received that dispatch?
 {¶ 145} "A. I can't recall the exact location.
 {¶ 146} "Q. Okay. Now, I'm showing you on the board what's been marked as State's Exhibit 20, and there's like a little pen right there you can use.
 {¶ 147} "A. Okay.
 {¶ 148} "Q. And on the map, in looking at this, is this St. Elmo right in this area?
 {¶ 149} "A. Yes.
 {¶ 150} "Q. Okay. 1455 — I'm sorry, 2955 would be where on that?
 {¶ 151} "A. Just south of 62 — or 30th Street.
 {¶ 152} "Q. Okay. And this being 29th Street, would it be in this area over here?
 {¶ 153} "A. That's Rowland.
 {¶ 154} "Q. I'm sorry. In this area?
 {¶ 155} "A. I believe so.
 {¶ 156} "Q. Okay. And describe to the jury what happened once you received some type of call about something going on?
 {¶ 157} "A. Well, myself and Deputy Rainsberger responded to the area. While en route to the area, our dispatch advised that the suspect was possibly driving a Lincoln, *Page 15 
light blue Lincoln Town car. And while en route, dispatch advised that the Lincoln Town Car had just driven by the house going northbound on St. Elmo.
 {¶ 158} "Q. What happened next?
 {¶ 159} "A. At that time I was traveling eastbound on Rout 62 near Rowland Avenue, I observed a light blue Lincoln Town car turn and go westbound on 62 from St. Elmo.
 {¶ 160} "Q. Can you describe to the jury where that's at? In looking at this map, do you see where Route 62 is?
 {¶ 161} "A. Right — do you want me to —
 {¶ 162} "Q. You can tap on the screen and it will show.
 {¶ 163} "A. Right there is Rowland. That's where I was traveling eastbound.
 {¶ 164} "Q. When you say "eastbound", could you put an arrow what you mean?
 {¶ 165} "A. I'm sorry. Traveling eastbound.
 {¶ 166} "Q. You were traveling eastbound and where did you see the Defendant's vehicle at that point?
 {¶ 167} "A. It was coming out of St. Elmo turning and going westbound.
 {¶ 168} "Q. Okay. How far would you say he was from that residence?
 {¶ 169} "A. I don't know exactly where the residence is south of 62. I seen him right at the corner.
 {¶ 170} "Q. Right at the corner?
 {¶ 171} "A. Right, turning onto 62.
 {¶ 172} "Q. What did you then proceed to do at that point? *Page 16 
 {¶ 173} "A. At that time I advised my dispatch that I — of the vehicle description. The dispatch advised me that that was the vehicle and that the occupant of the vehicle and that the occupant of the vehicle was Jakei Jackson and that he had a couple warrants for his arrest. At that time I turned around on the vehicle and initiated a traffic stop.
 {¶ 174} "Q. Okay. And is the person that you made that initial stop with in that Lincoln Town Car, is he in the courtroom today?
 {¶ 175} "A. Yes.
 {¶ 176} "Q. Can you describe to the Court where he's at and what he's wearing?
 {¶ 177} "A. Sitting at the Defendant's table with a black and white shirt.
 {¶ 178} "Q. Thank you.
 {¶ 179} "Now, you indicated Officer Rainsberger was working on that call as well?
 {¶ 180} "A. Correct.
 {¶ 181} "Q. And what did you do after you took the Defendant into custody? Where did you end up going?
 {¶ 182} "A. I took him to the Stark county Jail.
 {¶ 183} "Q. Okay. And Paskal Raisnskberkger, is he the one that responded to the residence?
 {¶ 184} "A. Yes.
 {¶ 185} "Q. Was he the one also who ended up taking the photos of her residence at that time?
 {¶ 186} "A. Yes."
 {¶ 187} Transcript at 283-287. *Page 17 
 {¶ 188} Based upon the evidence introduced at trial, the jury did not lose its way in finding Appellant guilty of violating the protection order. The jury was in a better position to observe the witnesses' demeanor and weigh their credibility, and we find the convictions were not against the manifest weight of the evidence.
 {¶ 189} The judgment of the Stark County Court of Common Pleas is affirmed. *Page 18 
 JUDGMENT ENTRY
For the reason stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to Appellant. *Page 1